# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 23-CR-4011-LTS-KEM |
| Plaintiff, | |
| vs. | **REPORT AND RECOMMENDATION** |
| KEVON SPRATT, | |
| Defendant. | |

Defendant Kevon Spratt is charged with multiple counts stemming from an alleged string of robberies: bank robbery; attempted bank robbery; interference with commerce by robbery; use of a firearm during and in relation to a crime of violence; and felon in possession of a firearm. Doc. 30. Spratt moves to suppress evidence seized from his vehicle on November 14, 2022. Doc. 33. The Government resists. Doc. 41. I held a hearing on the motion on May 16, 2023, and admitted the following exhibits without objection:

- **Exhibit A:** Report of Deputy Beckman (Doc. 34-1);
- **Exhibit B:** Report of Sergeant Peterson (Doc. 34-2);
- **Exhibit C:** Report of Officer P. Tisher (Doc. 33-2);
- **Exhibit D:** Report of Detective Sitzman (Doc. 33-3);
- **Exhibit E:** Report of Detective Grimsley (Doc. 33-4);
- **Exhibit F:** Video of traffic stop – vehicle dash camera (Doc. 33-5);
- **Exhibit G:** Complaint – *State of Iowa v. Kevon Spratt* (Doc. 33-6);
- **Exhibit H:** State search warrant documents (Doc. 33-7);
- **Exhibit 1:** Video – Officer Tisher body camera;
- **Exhibit 2:** State search warrant documents (Doc. 50) (*duplicate of Exhibit H above*);

- **Exhibit 3:** Email 10/24/2022 re: Convenience Store Armed Robberies – Sgt Bluff and Dakota City (Doc. 50-1);
- **Exhibit 4:** Email 11/12/2022 re: Robbery (Doc. 50-2);
- **Exhibit 5:** Email 11/11/2022 re: Kevon Spratt (Doc. 50-3);
- **Exhibit 6:** Email 10/25/2022 re: Situational Awareness—Robberies UPDATE (Doc. 50-4);
- **Exhibit 7:** Video – Officer Tisher vehicle dash camera.

Doc. 49. The parties also presented testimony from Detective Michael Sitzman and Officer Patrick Tisher with the Sioux City Police Department (SCPD); Deputy Frederick Beckman and Sergeant Douglas Boetger with the Woodbury County Sheriff's Office (WCSO), and Assistant Chief Brent Rosendahl and Officer Travis Hutzell with the Sergeant Bluff Police Department (SBPD). *Id.*

I recommend **denying** the motion to suppress (Doc. 33).

## I. FACTS AND BACKGROUND[1]

In the fall of 2022, a string of robberies occurred in the Iowa, Nebraska, and South Dakota tri-state area. An email was sent to law enforcement at 4:43 p.m. on Monday, October 24, 2022, indicating two robberies had occurred at businesses in Dakota City, Nebraska, and Sergeant Bluff, Iowa. Ex. 3. The email included photos from the robberies, which depict a person dressed in all black with their face and head covered in black. The email stated the same person was suspected of committing both robberies: a "dark skinned male with a tattoo on his left hand" who displayed a black, semi-automatic handgun with gold on the ejection port, and was believed to have used a vehicle parked nearby. The email also indicated a third robbery occurred that day at a store in

---

[1] The facts in this section are taken from the testimony at the suppression hearing and the exhibits admitted into evidence. Docs. 49, 59.

Sioux City, Iowa. Although surveillance footage was not yet available for the Sioux City robbery, the email said the suspect displayed a handgun and wore all dark clothing and had his face covered. The following day, on October 25, 2022, an update email (Ex. 6) was sent to law enforcement, alerting them that it appeared the same suspect committed all three robberies. The email included a bulletin with photographs from the robberies and described the suspect as a "dark-skinned male with a tattoo on his left hand," that he wore "all dark clothing and a dark face/head covering," and that he displayed a black semi-automatic firearm with a gold ejection port. Ex. 6.

SCPD Detective Michael Sitzman was assigned to investigate the October 24 robbery in Sioux City, and was aware of the prior two robberies in Dakota City and Sergeant Bluff. On October 25, the day after the Sioux City robbery, another officer identified Spratt as the person captured in photographs from the Sioux City robbery. Detective Sitzman testified that he relayed information to other law enforcement officers, including Officer Josh Fleckenstein, about the suspect. Detective Sitzman saw Spratt's vehicle in a particular neighborhood in Sioux City around November 9, but was unable to tie it to a specific residence. Detective Sitzman stated he believed he had probable cause to charge Spratt at that point but did not have a specific address for which to write a search warrant application.

On November 11, Detective Sitzman sent an email (Ex. 4) to other Sioux City police officers notifying them that he was investigating the Sioux City robbery and had identified "Kavon Spratt" as a suspect in that robbery and others (the ones in Dakota City and Sergeant Bluff and possibly one in Jefferson, South Dakota). He said Spratt was considered armed and dangerous and provided a description of Spratt's vehicle ("a silver 2 door Toyota Solara" with a specific Iowa license plate and a "black rag top"), and indicated it had been seen around an identified block in Sioux City. Detective Sitzman explained he was not certain where Spratt resided in order to request a search warrant

3

and asked that the vehicle "be left alone" and that officers not "actively look for the vehicle" but to contact him if they saw where Spratt was living or if he was stopped by law enforcement.

The following week, on November 14, Detective Sitzman drove by a specific block to look for Spratt's vehicle and attempt to identify Spratt's residence. He was preparing a search warrant application to search Spratt's vehicle, person, and cell phones. He was at least halfway through drafting the affidavit in support of a search warrant. As he was drafting the affidavit, he heard a report of an attempted bank robbery in Salix, Iowa. He learned that the suspect was identified as a slender, black male, wearing all black, and that he displayed a firearm and threatened to use force if necessary. Detective Sitzman found this consistent with the modus operandi for the other three robberies, and suspected Spratt committed the attempted bank robbery. He then drove by the block where he believed Spratt was staying to look for Spratt's vehicle, but he did not see the vehicle there at that time; however, he did not share that information with other officers.

Various law enforcement officers responded to Salix to investigate the attempted bank robbery, including Assistant Chief Rosendahl and Officer Hutzell (SBPD), Sergeant Douglas Boetger (WCSO), and Officer Tisher (SCPD). The officers learned that the suspect in the attempted bank robbery in Salix was identified as a black male with dark clothing. They also received information about a silver car with a black roof. Assistant Chief Rosendahl and Officer Hutzell recalled receiving a specific license plate number, and Officer Hutzell and Sergeant Boetger both heard Kevon Spratt's name mentioned. These officers ended up locating Spratt's vehicle headed northbound on I-29, where they ultimately stopped the vehicle.

Assistant Chief Rosendahl was also aware, prior to the Salix attempted bank robbery, that Kevon Spratt was a suspect in the other robberies. After the reports of the incident in Salix, he parked and watched I-29 in the Sergeant Bluff area because it was

4

the main route from Salix (to the south) to Sioux City. He was looking for a silver car with a dark top and specific license plate. He saw a vehicle matching that description and plate number driving northbound on I-29. He believed he had reasonable suspicion to stop the vehicle, but did not immediately do so for officer safety (he was the only officer present). He followed the car, which exited I-29 and moved into the right turn lane on the exit ramp. The car then abruptly turned left when the stop light changed. Assistant Chief Rosendahl testified this constituted an improper turn, which provided probable cause to stop the vehicle.[2] He still did not do so, again due to officer safety

---

[2] The video from Sergeant Boetger's vehicle shows the intersection that Assistant Chief Rosendahl testified about, which consists of a single-lane exit ramp (Singing Hills Blvd exit) that ends in two lanes at a stop light—the left lane is marked with arrows to go straight or turn left, and the right lane is marked with a right-turn only arrow. Ex. F. at 10:40-11:10. The video also contains radio traffic between the officers, discussing where Spratt was located. After Sergeant Boetger exits at Singing Hills Boulevard and heads west, officers indicate that Spratt had turned around and was headed back east, at which point Sergeant Boetger turns around to follow, and two SCPD vehicles can be seen joining in as well (for a total of five law enforcement vehicles). The following conversation occurs around this time:

> Unidentified officer: "Are we taking him? Are we taking him?"
>
> Unidentified officer: "No"
>
> Sgt. Boetger: "[Unintelligible] we've got all the red lights in the world flashing down here. Did he use his turn signal there?"
>
> Unidentified officer: "No, I don't have any traffic violations as of yet."

They continue to follow Spratt's vehicle back onto the interstate, again headed northbound. Sergeant Boetger confirms with dispatch the information they have and do not have at that point (a black male and Spratt's vehicle description, including a license plate; no other physical description, such as dreadlocks, because the bank robber's face was covered except for his eyes). Sergeant Boetger asks if they have "anything for a stop and hold" and another officer answers "apparently not." It was at that time that a SCPD vehicle passes the other vehicles with its red lights flashing. Sergeant Boetger can then be heard saying "looks like the Sioux City car is going to be stopping him," and they all stop on the side of the interstate. All of the officers get out of their vehicles and stand by their vehicles (which they appear to use to provide cover) as Spratt gets out of his vehicle with his hands raised. Ex. F. at 11:48-15:05.

5

concerns. He continued to follow the car and saw the driver looking behind him in the mirrors and "fishing in" the passenger area of the vehicle.

Officer Hutzell saw Assistant Chief Rosendahl following a silver car with a black roof and trailed them. He recalled knowing about a silver car with a black roof from prior law enforcement bulletins. He believed that as they followed the vehicle, they had probable cause to conduct a traffic stop. This was based on the prior intelligence about Kevon Spratt and his vehicle and the timing and proximity between the attempted bank robbery and seeing Spratt's vehicle. Detective Sitzman testified that Spratt's vehicle was stopped around eleven to twelve miles from the bank in Salix, and less than twenty minutes after the attempted robbery occurred.

Sergeant Boetger recalled hearing Kevon Spratt's name in addition to the Salix suspect's description. He was also already aware that Spratt was a suspect in other robberies and knew his vehicle description. When Sergeant Boetger joined in following Spratt's vehicle, he was looking for a possible traffic violation to provide probable cause to stop the vehicle because it makes the case more solid. He did not see any. There was also no description provided of a suspect vehicle from the attempted bank robbery in Salix. Sergeant Boetger believed they had reasonable suspicion to stop Spratt's vehicle based on information from the attempted bank robbery (based on a description of the suspect and the modus operandi from that and prior robberies), but he did not stop the vehicle.

Officer Tisher testified the only information provided after the attempted bank robbery in Salix was that the suspect was possibly a black male. He was already aware of the suspect and vehicle information from the prior robberies; specifically, he believed the suspect's name was "Spragg" and knew the suspect vehicle was identified as a silver, two-door Toyota with a black roof. He testified that after the attempted bank robbery in Salix, Officer Fleckenstein said they could be looking for the same suspect as the prior

6

robberies, and Officer Tisher believed the same person may have attempted to rob the bank in Salix. When Officer Tisher learned the SBPD officers had located the suspect vehicle, he went to the area and joined in following the silver car with a black roof. Officer Tisher was the only law enforcement vehicle with its lights on at that point (the others had either shut theirs off or never had them on). Officer Tisher believed there was probable cause to stop the vehicle, based on the information from the prior robberies and the information from the attempted bank robbery. He intended to conduct a felony stop rather than a traffic stop, but testified the vehicle pulled over before he stopped it (though he conceded he was behind the vehicle with his patrol lights flashing and a person would most likely pull over under those circumstances).

After the stop, officers arrested Spratt and ultimately towed his vehicle to the police department, where it was secured. Detective Sitzman obtained a search warrant for Spratt's vehicle. During a search of the vehicle, officers found a package with Spratt's name and address on it and ultimately a black Kimber 9mm handgun with a gold ejection port and a gold or copper-colored barrel.

Deputies later learned that a victim of the attempted bank robbery said the suspect used a black handgun (but did not mention a gold ejection port). A separate witness reported seeing a silver car with a black top parked near his residence to the north of the bank. Deputies did not learn this information, however, until after officers stopped Spratt.

Detective Sitzman identified the portions of the search warrant affidavit (Exhibit 2) that contained the information he knew before learning of the attempted bank robbery (all but one paragraph, which is crossed through on Exhibit 2). Prior to learning of the attempted bank robbery, Detective Sitzman knew the following information:

*The October 24 robbery at Check Into Cash store in Sioux City:*
- The store's surveillance video showed that at 10:04 a.m., the suspect—a black male with a tall slender build, "wearing black Nike sweat pant style

7

- pants, a black long sleeve shirt, black shoes, coat or hoodie, black gloves with a white band around the wrist, and a black face covering which [wa]s possibly a shirt wrapped around his head"—entered the store.
- The suspect pulled a handgun that appeared to have a copper or gold ejection port, which he pointed at an employee.
- Surveillance footage from a nearby business showed that approximately thirty minutes before the robbery, "a silver 2 door passenger car with black convertible top" pulled into the business, turned around, and parked. Approximately one minute before the robbery occurred, a person matching the robbery suspect got out of the car, walked to the area of the store that was robbed, and went inside. A few minutes later, the same person went straight from the store to the vehicle and drove away.
- Surveillance video from a bridge connecting South Sioux City and Sioux City showed the "suspect vehicle" drive from South Sioux City to Sioux City at around three hours before the robbery, and then drive back from Sioux City to South Sioux City a few minutes after the robbery.

*October 16 robbery at Food and Fuel store in Dakota City:*
- At 8:05 p.m., a suspect robbed the store at gunpoint. Video from the store showed the suspect was "a black male with a tall, slender build . . . not wearing gloves and . . . having a tattoo covering most of his left hand." The suspect wore "the same clothing description as seen" at the Sioux City robbery.
- After the Dakota City robbery, surveillance footage from a nearby business showed a silver, two-door car with a black, convertible top leave the area.

*October 22 robbery at Pump and Pak store in Sergeant Bluff:*
- At around 7:10 p.m., a suspect, "described as a taller, thin black male wearing all black clothing," robbed the store at gunpoint. Video surveillance from inside the store "shows what appears to be the same suspect wearing the same clothing" but the suspect was wearing black gloves with a white stripe around the wrists.
- The handgun displayed by the suspect was black with a copper or gold ejection port.
- Video surveillance from outside the store showed a silver, two-door car with a black, convertible top "leaving the area of the gas station after the robbery."

8

> *Information officers had identified about Spratt:*
> - Spratt as the suspect based on information from officers and social media;
> - Spratt's vehicle as a silver 2008 Toyota Camry Solora (photos of the vehicle had been posted on Spratt's social media); and
> - Spratt's social media had photos posted after the robberies that showed Spratt holding large stacks of United States currency, while one photo showed Spratt in the Solora holding a black handgun with a gold or copper ejection port.

Ex 2. Information that Detective Sitzman learned and added to the affidavit after the November 14 attempted bank robbery included a description of that attempt:

- The suspect tried to enter the bank lobby and walked up to the drive-up window between 8:30 or 9:00 a.m., before the bank was open.
- When an employee left the back door around 12:00 p.m., a tall, slender, black male grabbed her, demanded she go inside, and then went inside to look for money.
- Witnesses saw the suspect get into a silver, two-door car with a black, convertible top.
- Spratt was stopped on northbound I-29 driving in a vehicle matching that description.

Detective Sitzman testified he believed Spratt is six feet or six feet and one inch in height and that he weighs around one-hundred-seventy or one-hundred-eighty pounds. Detective Sitzman did not identify Spratt's residence until after his vehicle was searched (a package with his name and address was located inside his vehicle when it was searched).

## II. DISCUSSION

Spratt asserts that law enforcement officers lacked probable cause to stop him and his vehicle on November 14, 2022, and thus, subjected him to an unreasonable seizure. He argues that the court must suppress any evidence seized as a result of the illegal seizure. Spratt points out that prior to him being stopped, officers lacked certain information about the suspect from the attempted robbery in Salix that officers had from

9

Case 5:23-cr-04011-LTS-KEM   Document 65   Filed 07/12/23   Page 9 of 13

the prior robberies—a description of the suspect vehicle, a description of the firearm used by the suspect, or that the suspect had dreadlocks. Spratt also points out that the victim at the attempted bank robbery described the suspect as being approximately five foot nine inches tall and one-hundred-thirty to one-hundred-forty pounds (compared to his height being taller and him weighing more). Spratt does agree that "tall, slender, black male" would fit either of these descriptions. Spratt argues the officers could not have collectively known his vehicle was not in the area of his suspected residence right after the attempted bank robbery because Detective Sitzman did not share that information with the other officers.

The Government responds that the officers collectively had probable cause to stop the vehicle and arrest Spratt, based on the information from the prior robberies in addition to the information from the attempted bank robbery in Salix. At a minimum, the Government argues the officers had reasonable suspicion to justify stopping the vehicle to identify the driver. This, in turn, would have led to learning Spratt was the driver, which would have provided probable cause to arrest Spratt and search the vehicle.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable* searches and seizures."[3]

> "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152, 125 S. Ct. 588, 160 L. Ed. 2d 537 (2004). Probable cause sufficient to make a warrantless arrest exists when "the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *United States v. Torres-Lona*, 491 F.3d 750, 755 (8th Cir. 2007). A "probability or substantial chance of criminal activity, rather than an actual showing of criminal activity" is sufficient. *Id*. at 756 (internal quotation omitted). "To determine whether an officer had probable cause to arrest an individual, we examine the events

---

[3] **U.S. Const. amend. IV** (emphasis added).

leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371, 124 S. Ct. 795, 157 L. Ed. 2d 769 (2003) (internal quotation omitted).[4]

I find the officers had probable cause to stop Spratt's vehicle and to arrest him and search his vehicle. First, surveillance footage from the three prior robberies (in Sergeant Bluff, Dakota City, and Sioux City) showed what appeared to be the same person committing each crime. A law enforcement officer then specifically identified Spratt as the person shown in surveillance footage from the Sioux City robbery at Check Into Cash. Next, officers identified a silver car with a black top as being involved in the robberies in Dakota City, Sergeant Bluff, and Sioux City. Detective Sitzman learned that Spratt drove a vehicle matching that description. In addition, the same modus operandi was used to commit the three robberies—a black male dressed in all black entered the business, displayed a black firearm with a gold or copper ejection port, and demanded money. Based on this information, officers had probable cause to stop and arrest Spratt prior to the November 14 attempted bank robbery.

In addition to this information, officers learned that a black male with a tall, slender build attempted to rob the bank in Salix, and did so by approaching an employee (although this occurred when the employee left the bank rather than the suspect entering the bank). Based on that limited information, officers suspected Spratt committed the attempted bank robbery and were watching for his vehicle. Assistant Chief Rosendahl saw Spratt's vehicle around eleven to twelve miles away from the bank, heading northbound (from Salix toward Sioux City), and within twenty minutes of the attempted robbery at the bank. This information established probable cause.[5] In addition, that

---

[4] *United States v. Jones*, 535 F.3d 886, 890 (8th Cir. 2008).

[5] *See id.* (finding probable cause where bank robbery victim provided description of suspect shortly after the robbery (height, build, race, clothing worn, and direction suspect left in),

11

vehicle was driven in a suspicious manner after Assistant Chief Rosendahl began following it—going to the right-turn lane after exiting I-29 and then abruptly turning left, turning around, and driving in the opposite direction from which it came, and then reentering the interstate to again drive north. This further supports probable cause to stop and arrest Spratt, and to search his vehicle.

In the alternative, the Government argues the evidence found in Spratt's vehicle would have been independently located and admissible under the inevitable discovery doctrine. Spratt argues the later search warrant would not provide inevitable discovery because you could not be certain evidence would still have been located in the vehicle if it had been searched later (after Detective Sitzman obtained a search warrant). I need not address this argument based on my finding above.

### III. CONCLUSION

I respectfully recommend **DENYING** Spratt's motion to suppress (Doc. 33).

Objections to this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1), Federal Rule of Criminal Procedure 59(b), and Local Criminal Rule 59, must be filed within fourteen days of the service of a copy of this Report and Recommendation; any response to the objections must be filed within seven days after service of the objections. A party asserting such objections must arrange promptly for the transcription of all portions of the record that the district court judge will need to rule

---

officers provided an updated description after security personnel saw someone similar shortly thereafter in the immediate vicinity, and then officers saw someone matching that description walking about a mile away from the bank less than thirty minutes after the robbery occurred); *see also* **United States v. Washington**, Crim. No. 10-162 (ADM/SRN), 2010 WL 4884501, at *6-7 (D. Minn. Aug. 24, 2010), *report and recommendation adopted* 2010 WL 4884458 (relying on *Jones* and distinguishing cases cited by defendant that held a vague description may be insufficient to establish probable cause).

on the objections.[6] Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections.[7] Failure to object to the Report and Recommendation waives the right to de novo review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein.[8]

**DATED** July 12, 2023.

*Kelly K.E. Mahoney* (signature)
Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa

---

[6] **LCrR 59**.

[7] *See* **Fed. R. Crim. P. 59**.

[8] *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).